**Scranton Times v. Scranton Parking Authority**

C.P. of Lackawanna County, no. 2000-CV-3559.

*Timothy Hinton,* for petitioners.

*Judith G. Price,* for respondent Scranton Parking Authority.

*George Seig* and *Joseph A. O'Brien,* for respondent Jarbola.

NEALON, *J.*, February 21, 2001—The *Scranton Times, Sunday Times* and *Scranton Tribune* have filed a petition under the Right-to-Know Act seeking the disclosure of documents concerning parking violations and fines that were voided by the Scranton Parking Authority for designated vehicles operated by personnel of the Lackawanna County District Attorney's Office. Following a series of hearings and conferences on January 22, 2001, February 13, 2001, and February 20, 2001, the SPA and District Attorney Andrew J. Jarbola voluntarily produced certain records and *The Times* withdrew its requests for other materials that it had previously demanded. Based upon those disclosures and concessions, the remaining issues in dispute are limited to (1) records reflecting the geographic location of each voided parking violation and (2) the SPA's computer printouts itemizing fines which were issued, but not collected, for parking infractions by county vehicles that had been assigned to the district attorney and first assistant district attorney. Since the documents requested are "public records" and their disclosure with certain redactions will not reveal the institution or result of any criminal investigation, nor will it compromise the personal security of any law enforcement personnel or other person, *The Times'* request to inspect those materials will be granted.

## I. FACTUAL BACKGROUND

The SPA maintains the jurisdiction to enforce parking violations in the downtown commercial (C-D) district which is comprised of a several block radius around the Lackawanna County Courthouse and the city magistrate's office. (See affidavit of SPA executive director, Kevin

Conway, ¶1.) The SPA is empowered to assess fines of $20 for meter overtime violations and $50 for parking in a handicapped designated space or within 20 feet of a fire hydrant. The penalty for a parking meter violation may be reduced to $10 if payment is delivered to the city treasurer's office within 24 hours of the issuance of the ticket. If the fines are not paid within five days, the penalty is increased to $100, plus payment of costs of prosecution and the delinquent fines are processed into citations at the city magistrate's office. (*Id.,* ¶2; file of council no. 41 of 1987, §§12, 16; file of council no. 36 of 1999, §§12, 16.)

Because of "the limited parking available around the courthouse" and the need for law enforcement personnel to have "immediate access to the courthouse facility . . . for the performance of official law enforcement duties and activities," the SPA formulated a "policy of not processing parking tickets issued to . . . undercover vehicles . . . utilized by law enforcement professionals in performing law enforcement related business and activities" in the Lackawanna County Courthouse and the city magistrate's office. Under this policy, the SPA would enter designated license plate numbers into its computer so that tickets which were issued to undercover vehicles would not be forwarded to the city magistrate's office to be processed as citations. Although parking tickets would be issued by SPA meter attendants who were unaware of the identity of the undercover vehicles, they would not be transmitted by the SPA computer to the city magistrate's office once they became delinquent for nonpayment within five days. Additionally, in order "to ensure accountability," former Chief County Detective

Walter Carlson required each undercover detective "to collect and maintain any parking tickets issued to their vehicles" so that they could be placed into "a designated repository" for inspection by the SPA. (See SPA's answer to *The Times'* petition, exhibit A, pp. 1-2.)

After Mr. Carlson left the employ of the district attorney's office in July 1997, the district attorney provided the SPA with a confidential list of undercover vehicles that were to be immune from parking violations. (*Id.,* p. 2.) By letter dated May 1, 1997, the district attorney furnished the SPA with the license plate numbers for 15 vehicles which had been classified as undercover. On April 8, 1998, the district attorney forwarded a revised list to the SPA which increased the number of undercover vehicles to 22. (See transcript of proceedings of hearing dated 1/22/01, pp. 29, 31-33.) The number of parking tickets that were voided by the SPA for those vehicles which had been denominated as undercover totaled 1,722 in 1998 and 1,831 in 1999. (See transcript of proceedings of hearing dated 2/13/01, pp. 4-6.)

Due to their reported concern regarding the quantity of undercover vehicles and the location of the parking violations, the executive director and solicitor for the SPA approached the new chief county detective, Thomas Dubas, in January 2000 to discuss revision of the undercover vehicle list. As a result of that meeting, "the quantity of vehicles was dramatically reduced," (see SPA's answer to *The Times'* petition, exhibit A, p. 3), and by letter dated May 25, 2000, Chief Detective Dubas provided an updated list to the SPA which designated three vehicles as undercover. (T.H. dated 1/22/01, p. 33.) Consequently, the number of parking tickets which were

voided by the SPA for undercover vehicles between May 25, 2000 and December 31, 2000, decreased to 255. (T.H. dated 2/13/01, p. 5.)

On April 5, 2000, *The Times'* managing editor transmitted a written request to the SPA solicitor for a copy of "an apparent agreement between the Scranton Parking Authority and the Lackawanna County District Attorney's Office which calls for the authority to excuse parking tickets issued to certain vehicles assigned to the district attorney's office." In its correspondence, *The Times* indicated that it intended "to review this information similar to the way *The Times-Tribune* recently reviewed parking tickets which were voided by various officials of the City of Scranton. That review, you may recall, resulted in the Parking Authority being reimbursed for tickets which were voided inappropriately." (See *The Times'* petition to obtain access to records, exhibit A.) By letter dated April 6, 2000, the SPA solicitor forwarded *The Times'* request to the district attorney and advised him that "[b]ecause of the law enforcement and possible security issues involved, the Board of Directors of the Authority has instructed me to request that your office be responsible for responding to this request of the '*Times-Tribune.*' " (*Id.,* exhibit B.)

On April 13, 2000, *The Times'* managing editor forwarded a supplemental request to the SPA solicitor demanding production of records concerning tickets that were voided for parking violations other than overtime meter offenses. (*Id.,* exhibit C.) The SPA executive director forwarded a detailed reply to *The Times* on April 24, 2000, which concluded with the caveat that "District Attorney Andrew Jarbola has indicated to me that a re-

sponse to your various requests will be forthcoming in the very near future." (*Id.,* exhibit D, p. 4.) On June 12, 2000, counsel for *The Times* delivered a letter to the district attorney renewing the demand for certain materials and requesting an immediate response so that "this matter can be resolved without judicial intervention." (*Id.,* exhibit E.) In the absence of any response, *The Times* commenced this litigation on July 20, 2000, by filing a petition under the Right-to-Know Act seeking access to the SPA-district attorney's office records from 1997 to 2000 relating to the foregoing agreement.

In its answer to *The Times'* petition, the SPA produced three letters that it had received from the district attorney's office identifying certain vehicles as undercover. However, the SPA redacted the vehicles' license plate numbers from that correspondence since "[t]he Lackawanna County District Attorney's Office has requested that for the safety of the officers involved and to preserve the integrity of the institution and progress of criminal investigations, the Scranton Parking Authority not release parking ticket information, the license plate numbers and vehicle identification numbers contained on the list submitted by the district attorney's office to the Scranton Parking Authority." (See SPA's answer to petition, ¶9, exhibits A and B.) The district attorney filed a separate response to *The Times'* petition in which it objected to the document requests and asserted "that the records contain confidential and sensitive information, the disclosure of which could negatively effect the safety of law enforcement officials and would, otherwise, be contrary to the interest of justice." (See district attorney's response to petition, ¶¶10, 12, 15-17.)

During the subsequent evidentiary hearings, *The Times* withdrew its demand for information regarding the license plate numbers and make/model identification characteristics for the undercover vehicles in light of the security concerns for detectives who operated those vehicles. (T.H. 1/22/01, pp. 6-7.) In addition, counsel for the district attorney voluntarily revealed the number of undercover vehicles identified in the letters to the SPA dated May 1, 1997, April 8, 1998, and May 25, 2000, (*id.,* pp. 29, 31-33, 41), and the SPA disclosed its tally of the total number of tickets voided for those vehicles in 1998, 1999 and 2000. (T.H. 2/13/01, pp. 4-6.) The district attorney also confirmed that with the exception of one automobile which was personally owned by a Scranton police officer who was a member of the auto theft task force, all of the undercover vehicles identified in the correspondence addressed to the SPA were registered or leased as official vehicles of the district attorney's office. (*Id.,* pp. 7-10.)

The district attorney originally indicated that there were no documents that had been prepared prior to the filing of this lawsuit which identified those individuals who were denoted as the primary users of the vehicles that had been designated as undercover. (*Id.,* pp. 12-13, 17.) However, upon further inspection, the district attorney's office did discover the undercover vehicle listings for 1997, 1998, 1999 and 2000 and those records were submitted for an in camera review by the court on February 20, 2001.

The district attorney submits that the lists produced by his office identify assigned operators for each vehicle but only intends that designation to ascribe responsibil-

ity for the vehicle's maintenance and service. In support of its contention, the district attorney produced an internal memorandum prepared by its auto theft and insurance fraud task forces which reflects that the vehicle and license plate number which had been assigned to the district attorney on the 1997-1999 lists were actually being operated during that time by Myles R. Walsh, the executive director for the auto theft task force. (See T.H. dated 2/20/01, pp. 39-45.) *The Times* counters that the district attorney's lists for 1997-2000 do not indicate that the persons identified as the principal operators had only been so designated for purposes of vehicle maintenance. (*Id.,* p. 48.)

The in camera review which was conducted in open court revealed that the overwhelming majority of the vehicles identified on the district attorney's lists for 1997-2000 had been allotted to undercover detectives and various task forces. (*Id.,* pp. 11-38.) The district attorney's itemization further revealed that vehicles and license plate numbers which had been assigned to the district attorney and the first assistant district attorney had been included on the lists of undercover vehicles which had been forwarded to the SPA. As a result, *The Times* requested that it be provided with separate computer printouts from the SPA delineating the parking tickets which had been voided for the vehicles assigned to the district attorney and first assistant district attorney.[1] (*Id.,* pp. 48-52, 60.)

---

1. Counsel for the SPA confirmed that the SPA computers print lists which segregate the tickets issued to each undercover vehicle. (*Id.,* pp. 5-6.) Therefore, individual computer printouts for the vehicles which were assigned to the district attorney and first assistant district attorney have already been prepared and are readily available. See

The SPA has generated computer printouts which detail the parking tickets that were voided for each vehicle that was classified as undercover by the district attorney. *The Times* has agreed that the license plate numbers and vehicle identification information contained on those computer lists may be redacted for security reasons so that the identity of undercover vehicles will not be disseminated into the public domain. (See T.H. dated 1/22/01, pp. 5-7.)

The district attorney submits that the geographic location of each parking violation should likewise be deleted because of security concerns. *The Times* argues that its preliminary investigation into the SPA practice of excusing parking tickets for the vehicles in question suggested that members of the district attorney's staff and task forces may have abused that privilege by not confining their parking violations to instances in which they had to gain immediate access to the courthouse or city magistrate's office for arraignments, hearings and law enforcement activities. Specifically, *The Times* maintains that employees of the district attorney's satellite office in the Brooks Building, 436 Spruce Street, Scranton, would park their vehicles for the entire day on the 400 block of Spruce Street while they worked in their Brooks Building offices. According to *The Times,* only those parking tickets which were issued on the 500 blocks of Spruce Street and Linden Street and the 200 blocks of Adams and North Washington Avenue would relate to

---

*The Scranton Times L.P. v. The Scranton Single Tax Office,* 736 A.2d 711, 712-13 (Pa. Commw. 1999), *aff'd,* 564 Pa. 30, 764 A.2d 17 (2000) (the Right-to-Know Act does not require a public agency to "compile from public records information contained in those records.").

the discharge of law enforcement duties by district attorney personnel in the courthouse or city magistrate's office. If the SPA records reveal that a significant number of tickets were voided for parking offenses on the 400 block of Spruce Street, *The Times* contends that those documents will confirm that members of the district attorney's staff and task forces who work in the Brooks Building abused the SPA ticket voiding practice to subsidize parking expenses that should have been personally incurred by those district attorney employees. Hence, *The Times* posits that the geographic location of each parking violation should not be withheld from public scrutiny since it may demonstrate a potential misuse of public funds and its disclosure will not jeopardize any criminal investigation or compromise the safety of any person. (See T.H. dated 2/13/01, pp. 13-24.)

As stated above, *The Times* has also requested that it be provided with copies of the SPA computer printouts for tickets issued to the vehicles that were assigned to the district attorney and first assistant district attorney. *The Times* asserts that inasmuch as the district attorney and first assistant district attorney are furnished with complimentary parking spaces on the courthouse grounds, there should be no need for them to incur fines for parking offenses on public roadways in order to gain access to the courthouse and city magistrate's office. *The Times* submits that if downtown parking violations were incurred by those vehicles, it allegedly would indicate that the district attorney and first assistant district attorney had improperly allowed their staff to use vehicles which had been assigned to the district attorney and first assistant district attorney. *The Times* argues that permit-

ting office personnel to utilize those vehicles for extended periods of time would constitute a misuse of county property. (See T.H. dated 2/20/01, pp. 58-62.)

## II. DISCUSSION

### (A) *Right-to-Know Act*

More than 40 years ago, the General Assembly codified the common-law right of a citizen to inspect public records into a statute which is commonly referred to as the Right-to-Know Act, Act of June 21, 1957, P.L. 390, as amended, 65 P.S. §66.1-66.4. See *Tribune-Review Publishing Co. v. Allegheny County Housing Authority*, 662 A.2d 677, 679 (Pa. Commw. 1995), *app. denied*, 546 Pa. 688, 686 A.2d 1315 (1996). Section 2 of the Act provides that "[e]very public record of an agency shall, at reasonable times, be open for examination and inspection by any citizen of the Commonwealth of Pennsylvania." 65 P.S. §66.2. The phrase "public record" is statutorily defined, in relevant part, as:

"Any account, voucher or contract dealing with the receipt or disbursement of funds by an agency or its acquisition, use or disposal of services or of supplies, materials, equipment or other property and any minute, order or decision by an agency fixing the personal or property rights, privileges, immunities, duties or obligations of any person or group of persons: Provided, that the term 'public record' shall not mean any report, communication or other paper, the publication of which would disclose the institution, progress or result of an investigation undertaken by an agency in the performance of

its official duties, . . . , or which would operate to the prejudice or impairment of a person's reputation or personal security, . . . ." 65 P.S. §66.1(2).

The Act is intended to assure the availability of government information to citizens of the Commonwealth by permitting access to official information. *Arduino v. Borough of Dunmore,* 720 A.2d 827, 830 (Pa. Commw. 1998), *app. granted,* 559 Pa. 694, 739 A.2d 1059 (1998), *app. dismissed as improvidently granted,* 559 Pa. 415, 741 A.2d 195 (1999); *Vargo v. Dept. of Corrections,* 715 A.2d 1233, 1236 (Pa. Commw. 1998). Another purpose of the Right-to-Know Act "is to scrutinize the acts of public officials and to make them accountable for their use of public funds." *Tribune-Review Publishing Co. v. Dept. of Community & Economic Development,* 751 A.2d 689, 692 (Pa. Commw. 2000). A person's "right to examine a public record is not based on whether the person requesting the disclosure is affected by the records or if his or her motives are not pure in seeking them," *Weaver v. Dept. of Corrections,* 702 A.2d 370, 371 (Pa. Commw. 1997), *app. denied,* 553 Pa. 685, 717 A.2d 536 (1998), and "a citizen may not be denied access to public records because of lack of [personal] interest or for a lack of a 'legitimate' purpose." *Envirotest Partners v. PennDOT,* 664 A.2d 208, 212 (Pa. Commw. 1995). In fact, a requester need not provide any reason for demanding to inspect a public record. *The Scranton Times,* 736 A.2d at 713.

(B) *Public Record Classification*

Section 1(2) of the Act contemplates a two-step analysis in determining whether a document is subject to pro-

duction as a public record. The first step requires a determination of whether the requested document falls generally within the definition of "public record." "If it does, a determination of whether any of the stated exceptions to this general definition are applicable must be made." *Vargo,* 715 A.2d at 1236. In that regard, "a broad construction is to be given to the initial determination of whether a document is a public record, to be tempered as an opposing party brings into play the enumerated exceptions." *Legal Capital LLC v. Medical Professional Liability Catastrophe Loss Fund,* 702 A.2d 869, 871 (Pa. Commw. 1997), *aff'd,* 557 Pa. 10, 731 A.2d 132 (1999). Accord *Arduino,* 720 A.2d at 830 ("the definition of a public record must be liberally construed so as not to unduly restrict the public access to information granted by the Act.").

Public records generally fall into two categories: (1) accounts, vouchers, or contracts dealing with fiscal aspects of government, and (2) minutes, orders or decisions fixing personal or property rights of a person. The Supreme Court of Pennsylvania has concluded that the first category, *i.e.,* documents dealing with the receipt or disbursement of funds, should be interpreted expansively, whereas the second category, documents "fixing" the rights of persons, is to be afforded a "somewhat narrower construct." *North Hills News Record v. Town of Mc-Candless,* 555 Pa. 51, 55, 722 A.2d 1037, 1039 (1999); *Tribune-Review Pub. Co.,* 751 A.2d at 691. "While the overall emphasis of the Act is on disclosure, it seeks to provide a balanced formula which opens the administrative process to the scrutiny of the general public, and, simultaneously, protects the confidential nature of spe-

cific types of information." *Allegheny Cty. Housing Auth.,* 662 A.2d at 680.

It is beyond legitimate dispute that parking tickets which have been voided by an agency and computer print-outs itemizing fines that were not collected by an agency clearly constitute documents "dealing with the receipt or disbursement of funds by an agency." By utilizing the terminology "dealing with" in section 1(2) of the Act, the legislature intended to provide a broad interpretation such that "as long as the contract dealt with the possible appropriation of public funds, the contract was a public record subject to inspection." *The Morning Call Inc. v. Lower Saucon Twp.,* 156 Pa. Commw. 397, 401-402, 627 A.2d 297, 299 (1993); *Davis v. Newton Twp.,* 101 Lacka. Jur. 42, 48 (1999) (since a wrongful death settlement payment made by a township may result in higher insurance premiums for the governmental defendants, the settlement agreement relates to the possible appropriation of municipal funds and qualifies as a 'public record' under the Pennsylvania Right-to-Know Act.). Therefore, "any records related to 'disbursement of funds by an agency' in the possession of the agency are public records." *Arduino,* 720 A.2d at 831. See also, *Sapp Roofing Inc. v. Sheet Metal Workers' International Association, Local Union No. 12,* 552 Pa. 105, 713 A.2d 627 (1998) (private contractor's payroll records in possession of an agency are public records since they pertain to the receipt or expenditure of public funds).

If the tickets were merely for overtime meter violations and were paid within 24 hours, the assessed fine would be $10 per ticket, but that penalty could increase to $100 if the ticket were not paid within five days of its

issuance. Thus, the dollar amount of tickets voided in 1998 could have totaled between $17,220 and $172,200, whereas the figure for 1999 could have ranged between $18,310 and $183,100. Records related to the abatement of fines in those amounts unquestionably "deal with" the SPA's receipt or disbursement of funds.

It is equally clear that documents which reflect the identity of government employees, who were selected to enjoy the privilege of operating county vehicles that were immune from parking violations similarly pertain to agency decisions "fixing" the rights, privileges or immunities of a group of persons. However, even though a document may concern the collection or expenditure of funds or the establishment of rights, privileges or immunities of a person, it may nevertheless be shielded from disclosure if its publication would reveal "the institution, progress or result of an investigation undertaken by an agency in the performance of its official duties" or would "operate to the prejudice or impairment of a person's reputation or personal security." 65 P.S. §66.1(2).

(C) *Criminal Investigation/Personal Security Exceptions*

Since the Act favors disclosure, documents are presumed to be public records and "[i]n order to qualify for the exception, the agency must overcome the statutory presumption that the records sought are public." *Allegheny Cty. Housing Auth.,* 662 A.2d at 684. The Freedom of Information Act, 5 U.S.C. §552, "takes a more restrictive view of law enforcement records as an exception to the general rule of the availability of information

to the public." *Sullivan v. City of Pittsburgh, Dept. of Public Safety,* 127 Pa. Commw. 339, 343, 561 A.2d 863, 865 (1989), *app. denied,* 525 Pa. 591, 575 A.2d 120 (1990). Under the Pennsylvania statute, "[t]his exclusion not only applies to active investigations, but it also applies . . . to records related to completed investigations." *Commonwealth v. Mines,* 680 A.2d 1227, 1229 (Pa. Commw. 1996). For example, in *PG Publishing Co. v. County of Washington,* 162 Pa. Commw. 196, 638 A.2d 422 (1994), a newspaper sought disclosure of itemized cellular telephone billings of various county officials, including the district attorney and the drug task force unit. The trial court denied access to telephone numbers which related to "active criminal investigations," but on appeal, the Commonwealth Court modified the lower court ruling to include redaction of telephone numbers involving the institution, progress or result of any investigations, including those which had been completed. *Id.,* at 207, 638 A.2d at 427.

With regard to the personal reputation or security exception, the Commonwealth Court has observed "that for records to fall within the personal security exception they must be intrinsically harmful and not merely capable of being used for harmful purposes." *PG Pub. Co., supra* at 215, 638 A.2d at 431 (quoting *Young v. Armstrong School District,* 21 Pa. Commw. 203, 207, 344 A.2d 738, 740 (1975)). Rather, "it is our duty under the Act to determine only whether the public records themselves would operate to the prejudice or impairment of reputation, not whether their use with other information might have such harmful consequence." *PG Pub. Co., supra* at 214-15, 638 A.2d at 431; *Moak v. Phila-*

*delphia Newspaper Inc.,* 18 Pa. Commw. 599, 605, 336 A.2d 920, 924 (1975). For that reason, "[t]his concept of personal security flows from protection against personal harm rather than a potential invasion of harm." *Allegheny Cty. Housing Auth.,* 662 A.2d at 684; *Young, supra.*

The scope of the personal security or reputation exception is best illustrated by the fact specific determinations that have been made by the Pennsylvania courts on a case-by-case basis. For instance, a criminal defendant who has been convicted for sexually assaulting minor boys may not obtain copies of their confidential victim impact statements which the State Board of Probation and Parole had reviewed in making its decision to deny parole since the release of the information could operate to impair the victims' personal security or reputation. *Cicchinelli v. Pennsylvania Board of Probation and Parole,* 760 A.2d 914, 915 (Pa. Commw. 2000). Nor may an inmate inspect documents regarding the drug detection equipment utilized by a prison to detect the presence of drugs on visitors to the jail inasmuch as disclosure of that information could result in the introduction of drugs into the prison which could result in violence and harm to prison personnel and inmates. *Vargo,* 715 A.2d at 1238. Furthermore, the public may not be granted access to state police documents regarding sobriety and drug checkpoints, drug interdiction, and intelligence reports on subversive activity and terrorism since "allowing individuals to discover such procedures and anticipate or discern drug and alcohol checkpoints could lead to tip-offs, thus endangering police personnel." *Gutman v. Pennsylvania State Police,* 148 Pa. Commw. 567, 572, 612 A.2d 553, 556 (1992), *app. denied,* 533 Pa. 638, 621

A.2d 583 (1993). See also, *Weaver,* 702 A.2d at 372-73 (inmate not entitled to inspect the Pennsylvania Additive Classification Tool (PACT) manual used by the Department of Corrections to assess inmates and determine what level of custody is appropriate since "once an inmate knows of the criteria that went into making that determination, the inmate could manipulate the decision" and thereby secure inappropriate housing which "could endanger the inmate, other inmates or staff").

In contrast, if the records are not intrinsically harmful so as to jeopardize one's personal security, they are subject to disclosure. Although the *Gutman* court denied access to documents concerning sobriety checkpoints, drug interdiction and terrorism intelligence, it concluded that the Pennsylvania State Police Department was required to honor the "request for regulations concerning the responsibilities of the various state police bureaus and divisions and for regulations concerning the use of deadly force" as those documents were "not within the scope of any of the exceptions to the Act." *Gutman, supra* at 572, 612 A.2d at 556. Similarly, in *PG Pub. Co.,* the district attorney, drug task force, sheriff and coroner were not allowed to redact from the cellular telephone bill itemization any numbers which did not relate to a criminal investigation based upon the Commonwealth Court finding that "[t]he telephone numbers remaining do not in and of themselves trigger any risk of harm to individual security or reputation." *PG Pub. Co., supra* at 215, 638 A.2d at 431. Moreover, while the *Vargo* court denied an inmate's request for information pertaining to the drug detection equipment utilized by the Department of Corrections, it concluded that the DOC did not have

just and proper cause to deny, on the basis of the investigation or personal security exception, the inmate's separate request for disclosure of "information concerning its policies regarding the qualifications of personnel who administer the drug detection equipment." *Vargo,* 715 A.2d at 1239.

Instantly, as long as the license plate numbers and vehicle identification characteristics are deleted from the SPA computer printouts, the disclosure of the situs of the parking violations will not reveal any confidential information regarding a pending or completed criminal investigation, nor will it threaten the safety of undercover personnel. It is wholly inconceivable that even the most sophisticated criminal could somehow recall several years later that a particular vehicle (whose identity is being withheld) had received a parking ticket at a specific location in downtown Scranton on a given date in 1998 or 1999 such that [s]he would thereby be able to discover the current identity of undercover detectives or their vehicles. Since the SPA computer printouts are clearly records which relate to the receipt or disbursement of public funds and none of the stated exceptions in 65 P.S. §66.1(2) are applicable, *The Scranton Times* is entitled to inspect those materials under the Right-to-Know Act.

Production of the SPA's itemized list of parking fines assessed to the vehicles and license plate numbers assigned to the district attorney and first assistant district attorney similarly will not divulge any protected information regarding criminal investigations or law enforcement personnel, provided that the license plate number and vehicle make, model, color and body type are re-

dacted from the documents produced. The district attorney posits that inasmuch as other office personnel may have used those assigned vehicles on occasion, any SPA records detailing the tickets issued to those vehicles will not necessarily indicate that the parking violations were personally committed by the district attorney or first assistant district attorney. The district attorney's arguments are better addressed to the accuracy or validity of any prospective newspaper report regarding parking tickets received by the district attorney or first assistant district attorney and do not relate to the issue of whether those documents constitute public records under section 1(2) of the Act. Since the scope of judicial inquiry is confined to a determination of whether those computer itemizations are public records, and in light of the fact that none of the stated exceptions in 65 P.S. §66.1(2) alter their status as public records, *The Times'* request to gain access to those public records will be granted. An appropriate order will follow.

## ORDER

And now, February 21, 2001, upon consideration of the petition of *The Scranton Times, Sunday Times* and *Scranton Tribune* to obtain access to public records of the Scranton Parking Authority, the responses thereto of the Scranton Parking Authority and District Attorney Andrew J. Jarbola, and the argument of counsel during the hearings on January 22, 2001, February 13, 2001 and February 20, 2001, and in accordance with the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

(1) The petitioners' request to inspect public records under the Right-to-Know Act, 65 P.S. §66.1-66.4 is granted subject to the following conditions;

(2) The petitioners are to be granted access to the computer printouts prepared by the Scranton Parking Authority itemizing the parking tickets which were voided in 1997, 1998 and 1999 for the vehicles identified in the correspondence forwarded to the Scranton Parking Authority by the Lackawanna County District Attorney's Office on May 1, 1997 and April 8, 1998, provided that the license plate number and make, model, color and body type for each vehicle are redacted from the lists that are furnished to the petitioners;

(3) The Scranton Parking Authority shall produce for inspection by the petitioners separate computer printouts itemizing the parking tickets which were issued in 1997, 1998 and 1999 to the vehicles and license plate numbers that had been assigned to the district attorney and the first assistant district attorney, provided that the records produced by the Scranton Parking Authority shall first redact any reference to the license plate number and make, model, color and body type for both vehicles;

(4) The computer printouts which are to be produced by the Scranton Parking Authority pursuant to paragraph 3 of this order shall identify the separate itemizations by designating them as the "district attorney vehicle" list and the "first assistant district attorney vehicle" list; and

(5) A separate order setting forth the protocol to be followed by the respondents in producing the foregoing public records for inspection will be filed under seal and distributed only to counsel for the respondents.